IN THE UNITED STATES DISTRICT COURT
SOUTHERN  DISTRICT OF NEW YORK


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PHILLIPS-VAN HEUSEN CORP.,               :
CALVIN KLEIN, INC., and CALVIN           :
KLEIN TRADEMARK TRUST,                   :
                                         :
                     Plaintiffs,         :        Civil Action No.:  05 Civ. 6802 (JSR)
                                         :
               v.                        :
                                         :        **FILED ELECTRONICALLY**
CALVIN CLOTHING COMPANY, INC.,           :
and STAR RIDE KIDS, INC.,                :
                                         :
                     Defendants.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


<u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST
MOTION FOR PARTIAL SUMMARY JUDGMENT ON
COUNTS I, III, IV, V, VII, AND VIII OF THE COMPLAINT,
AND ON DEFENDANTS' COUNTERCLAIMS</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Calvin Klein Brand is Famous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

"Calvin" means CALVIN KLEIN to the Public and Media . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

CCC's Predecessor-in-Interest, CC Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Prior Interactions Between the Parties' Predecessors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

CCC's Acquisition of Calvin Youthwear . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

CCC's Subsequent New Calvin Marks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

The Ford Likelihood of Confusion Survey - The Marketplace . . . . . . . . . . . . . . . . . . . . . . . . 10

The Helfgott Likelihood of Confusion Survey - The New Calvin Applications . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.      Summary Judgment Is Appropriate Where, As Here, There Is No Genuine Issue
        Of Material Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II.     Plaintiffs Have Priority Over CCC in All Fields of Apparel Except Boys' Tailored
        Clothing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.    The New Calvin Marks Are Likely to Cause Confusion with CALVIN KLEIN . . . . . . 18

                (a) Strength of the mark . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
                (b) Similarity of the Marks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
                (c) and (d) Proximity of the Products and Bridging the Gap . . . . . . . . . . . . . . . . 20
                (e) Actual Confusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
                (f) Junior User's Bad Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
                (g-h) Quality of CCC's Products and Purchaser Sophistication . . . . . . . . . . . . . 22

IV.     Defendants' Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

**Page**

Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) . . . . . . . . . . . . . . . . . . . . . .  12-13

*Anheuser-Busch, Inc. v. Power City Brewery, Inc.*, 28 F. Supp. 740, 743 (W.D.N.Y. 1939) . .  20

*Atlantic Monthly Co. v. Fredrick Ungar Publ'g Co.*, 197 F. Supp. 524, 529-30
        (S.D.N.Y. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Bristol-Meyers Squibb Co. v. McNeil-PPC, Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992) . . . . . .  24

*Calvin Klein Indus. Inc. v. Calvins Pharms. Inc.*, 8 U.S.P.Q.2d 1269, 1271-72 (T.T.A.B. 1988) 4

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222-23 (2d Cir. 1987) . .  19

*Clark & Freeman Corp. v. Heartland Co.*, 811 F. Supp. 137, 142 (S.D.N.Y. 1993) . . . . . . . .  15

*Coca-Cola v. Busch*, 44 F. Supp. 405, 410 (E.D. Pa 1942) . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*,
        109 F.3d 275, 284 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Dwinell-Wright Co. v. White House Milk Co.*, 132 F.2d 822, 825 (2d Cir. 1943) . . . . . . . . . .  16

*Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp.*,
        105 F.2d 908, 911 (2d Cir. 1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) . . .  22-23

*France Milling Co. v. Washburn-Crosby Co.*, 7 F.2d 304, 305, 306 (2d Cir. 1925) . . . . . .  14, 17

*Grotrian Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*,
        365 F. Supp. 707, 716 (S.D.N.Y. 1973), *modified on other grounds*,
        523 F.2d 1331 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Information Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp. 2d 44, 50
        (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 13, 25

*James Burrough Ltd. v. Lesher*, 309 F. Supp. 1154, 1159 (S.D. Ind. 1969) . . . . . . . . . . . . . .  22

*James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 277-79 (7th Cir. 1976) . . . . . .  22

*Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 580 (2d Cir. 1991) . . . . . . . . . . . . .  12, 18

*Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Lois Sportswear U.S.A. Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872, 874-5 (2d Cir. 1986) 18,21

*Lon Tai Shing Co. v. Koch + Lowy*, 19 U.S.P.Q.2d 1081, 1097 (S.D.N.Y. 1990) . . . . . . . 21-22

*Miles Labs., Inc. v. Naturally Vitamin Supplements, Inc.*,
1 U.S.P.Q.2d 1445, 1455-60 (T.T.A.B. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987) . . . . . . . . . . 19

*Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . 24

*Nat'l Cable Television Assoc. v. Am. Cinema Editors, Inc.*,
937 F.2d 1572, 1577-78 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Nikon, Inc. v. Ikon Corp.*, 803 F. Supp. 910, 915-16 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . 19

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 216-7 (2d Cir. 2003) . . . . . . . . . 14, 16

*Physicians Formula Cosmetics Inc. v. West Cabot Cosmetics Inc.*,
857 F.2d 80, 82 n.1 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

*Plus Prods. v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004-5 (2d Cir. 1983) . . . . . . . . 18, 19

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.),
*cert. denied*, 368 U.S. 820 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*PPX Enters., Inc. v. Audiofidelity Enters, Inc.*, 818 F.2d 266, 271 (2d Cir. 1987) . . . . . . . . . . 21

*RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) . . . . . . . . . . . . . . . 21

*Scarves By Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir. 1976) . . . . . . . 22-23

*Syntex Labs., Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 568 (2d Cir. 1971) . . . . . . . . . . 19

*Volkswagenwerk AG v. Lieffring Indus., Inc.*, 188 U.S.P.Q. 650, 653 (T.T.A.B. 1975) . . . . . . 20

*Volkswagenwerk AG v. Wheeler*, 814 F.2d 812, 818 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . 21

*W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . 18

<u>Rules of Evidence & Procedure</u>

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Fed. R. Civ. P. 56(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## **<u>INTRODUCTION</u>**

This case involves a conflict between Plaintiffs' famous CALVIN KLEIN trademarks (including its common law CALVIN mark), and Defendants' limited rights to CALVIN for certain items of boys' and men's tailored clothing. In this motion, Plaintiffs seek judgment enjoining Defendants to use CALVIN only on the specific goods of its predecessor; namely, specific boys' and men's tailored clothing items.[1] In the accompanying motion, Plaintiffs will show that CCC's predecessor abandoned its rights to use CALVIN on men's tailored clothing items. By reason of both motions, it is respectfully submitted that Defendants' use of CALVIN should be limited to only the specific items of boys' tailored clothing of its predecessor. The relevant facts are largely undisputed, as set forth in Plaintiffs' accompanying Statement of Undisputed Material Facts (hereinafter, "Facts"). The only real dispute is the legal effect of those facts.

---

[1]   By this motion, Plaintiffs seek judgment in their favor as to the Complaint's Count I (declaration of priority over CCC for all apparel except boys' tailored); Counts IV, V, VII and VIII (infringement, false designation of origin, and unfair competition under federal, state, and common law), and Count III (an order of abandonment or cancellation of the New Calvin applications and registrations). Plaintiffs' trademark dilution claims will be mooted should the Court grant summary judgment on this motion. Plaintiffs further seek judgment on each of Defendants' counterclaims, as there is no genuine issue of material fact preventing such entry of judgment.

## FACTS

### The Calvin Klein Brand is Famous

CALVIN KLEIN brand apparel is advertised and sold throughout the U.S. and the world.  It is a billion-dollar business with a reputation to match, and the facts attest to legions of fans of Mr. Calvin Klein's taste, style, and aesthetic.  Defendants concede that the CALVIN KLEIN brand is famous.  Duhaime Decl. Exh. 1 (Defendants' Admissions to Plaintiffs' Requests to Admit (hereinafter, Defs. Admissions) Nos. 91, 103.  Indeed, Defendants' answer concedes it is a "mega brand."  Answer ¶ 21.

The CALVIN KLEIN brand didn't become famous overnight.  Mr. Klein and his companies have made concerted efforts to publicize the CALVIN KLEIN brand and image.  Calvin Klein, Inc. ("CKI"), its predecessors and their licensees spent hundreds of millions of dollars over the years in promotional efforts, which have paid off: Calvin Klein is a media darling (see p. 3-4, infra), and numerous brand recognition studies have shown that CALVIN KLEIN is one of the most recognized names in American fashion today.  See Facts ¶¶ 5, 18-24, 27-33.  Defendants concede (Counterclaim ¶ 28) that billions of dollars of CALVIN KLEIN products have been sold.

Calvin Klein has made an entree into nearly every conceivable corner of the apparel market.  A staggering array of apparel products and accessories have been sold under the CALVIN KLEIN brand, starting in the years indicated below, such as:

- women's coats and dresses (1968);
- women's sportswear, and ready-to-wear apparel such as pants, skirts, blouses, sweaters, and suits (1973-74);
- menswear, including tailored menswear (1976 or 1977);
- boys' and girls' jeans and other jeanswear (late 1970's), which was expanded in the mid to late-1980's;
- casual sportswear items for women and men, such as pants, shirts, knit tops, sweaters, jackets, dresses, skirts, and shorts;

- 3 -

- jeanswear for women and men, encompassing many denim and non-denim items including casual sportswear like shirts, shorts, dresses and jackets (1978);
- men's and women's underwear (1981-82 and 1983, respectively);
- women's hosiery (1985) and swimwear (mid to late 1980's);
- women's sunglasses, watches and other accessories (mid to late 1980's);
- infant's apparel (late 1970's until the early 1980's, and again in the early 2000's);

- jeans and casual sportswear for toddlers (late 1970's);
- men's and women's footwear (1984-85);
- men's and women's socks (1990); and
- children's underwear (approx. early 1980's)

Facts ¶¶ 5-16.  Calvin Klein Trademark Trust is the owner of corresponding incontestable registrations for the mark CALVIN KLEIN.  Duhaime Decl. Exh. 30.  See also Facts ¶ 17.[2]

In addition, in the mid to late 1980's, CKI's junior women's division was renamed Calvin, and advertisements and labels for this clothing line bore the name CALVIN alone.  Duhaime Decl. Exh. 15 (Miles-Graeter 3/18/03 Tr. 86-87).  The company has also denominated certain divisions or lines of apparel using variations on CALVIN KLEIN, including "Calvin Klein Sport" and "Calvin Klein Collection".  See Szeto Decl. Exh. O.

The CALVIN KLEIN brand also has expanded into items like bedding (mid-1970s); bath furnishings (1995); housewares (1995); and fragrances (early 1980's), including a men's CALVIN fragrance line under the name CALVIN.  Facts ¶¶ 10-11.

**"Calvin" means CALVIN KLEIN to the Public and Media**

Plaintiffs have produced in this litigation about two thousand articles published over the years in apparel trade publications and the general media which use "Calvin" or "Calvins" to refer to the CALVIN KLEIN image, brand, clothing, and famously controversial

---

[2]  CKI and/or its predecessors also used and registered other marks incorporating the Calvin Klein name, such as CK/CALVIN KLEIN (stylized), CALVIN KLEIN JEANS, CALVIN KLEIN CLASSICS.  Szeto Decl. Exhs. C, O.  For purposes of this motion, Plaintiffs will refer to the entire family of marks as simply CALVIN KLEIN, unless otherwise noted.

advertising.  The media's identification of "Calvin" with CALVIN KLEIN products intensified

after a highly publicized 1980 CALVIN KLEIN jeans ad campaign featuring Brooke Shields, in

which she asked "What comes between me and my Calvins?" and answered: "Nothing." See

Szeto Decl. ¶ 29.  That ad catapulted the CALVIN KLEIN brand to super stardom.  Thousands

of media articles used the phrase "me and my Calvins" to refer to that ad campaign, or to

CALVIN KLEIN jeanswear and underwear.  A 1995 *Forbes* article, noting the company's global

sales of nearly $1 billion in 1994, remarked on the global appeal of the brand:

> Will Calvin's name have cachet among foreigners?  Ad agency Young & Rubicam
> thinks so.  A Y&R database evaluates 7,500 brands worldwide.  In fashion, says
> Y&R, no other brand name comes close to Calvin's.  "The brand is damn close to
> a Coca-Cola or a Disney in terms of familiarity," says Edward Lebar, a senior vice
> president at [Y&R].  "Its brand equity goes way beyond its sales."

Szeto Decl. Exh. M (P009897).  Columnist Liz Smith, in a September 1990 article, noted "[e]ven

Webster's dictionary has recognized the power of Calvins – editors are considering adding the

word 'Calvins' to their 1991 edition!"  Szeto Decl. Exh. M (P010766); see also Vernon Tr. 14.

See Facts ¶¶ 35-41.

CKI over the years has made other uses of CALVIN alone in connection with a

number of products, including CALVIN KLEIN apparel.  When the parties' predecessors

cooperated to oppose registration of the mark CALVIN CONDOMS, infra p. 7, they presented

evidence about this and other apparel, prompting the U.S. Patent and Trademark Office ("PTO")

Trademark Trial and Appeal Board ("TTAB") to find that "a significant portion of the public and

trade has come to refer to at least certain of Opposer's CALVIN KLEIN products as simply

CALVINS."  Calvin Klein Indus. Inc. v. Calvins Pharms. Inc., 8 U.S.P.Q.2d 1269, 1271

(T.T.A.B. 1988).[3]  Further, there have been periodic uses of CALVIN on t-shirts like CALVIN

---

[3]  The Board did not hold that "Calvin" was exclusively associated with CKI, since
CCC's predecessor had made some use of its own CALVIN mark.  Id. at 1272.

100% ACTIVEWEAR, a line of shirts in the early 2000's referring to the famous "me and my

Calvins" ad campaign, and periodic use of CALVIN on other t-shirts until as recently as 2003.

See Szeto Decl. Exh. K.  Also, since the mid 1990's a  line of CALVIN KLEIN jeans for men

and women have been promoted as "The Calvin Bootcut" and "The Original Calvin."  Id.[4]

**CCC's Predecessor-in-Interest, CC Corp.**

       While CKI was building the CALVIN KLEIN "mega brand," CCC's predecessor,

Calvin Clothing Corp. ("CC Corp.") was producing, under various brands, tailored clothing for

men and boys – nothing else.  CC Corp. began making boys' and students'[5] tailored clothing in

about the mid 1930's, and in about 1972 obtained U.S. Trademark Registration No. 933,999 on

CALVIN for "boys' and students' tailored clothing, consisting of pants, slacks, top coats and

sport coats" ("the '999 Registration").  In the mid 1970's, CC Corp. added men's suits and sport

coats to its line (Fletcher 6/27/03 Tr. 20) and in 1976 obtained U.S. Trademark Registration No.

1,039,306 on CALVIN for "men's suits and sport coats".  (This is the use and registration that

was abandoned and is the subject of the accompanying motion to cancel.)  CC Corp. never

attempted to expand use of CALVIN into any line of apparel other than specific items of tailored

clothing for boys and men, Facts ¶¶ 44-45, or into any non-apparel products. Thus, for six

decades CC Corp. used the CALVIN label within the boys' tailored clothing area only, and only

for a few years within the men's tailored market.

       That CC Corp. never expanded into other apparel categories reflects the fact that

the apparel industry has numerous categories and subcategories of apparel, generally further

---

[4]  Except for possibly the CALVIN juniors' line in the 80's, such uses of "Calvin" alone
on clothing were accompanied with labels or hangtags showing the CALVIN KLEIN mark.
Duhaime Exh. 18 (Murry 8/7/03 Tr. 10).

[5]  "Students" was a term of art in the boys' tailored apparel field, designating a size range
for an older boy, or a boy too big for a boys' suit.  Facts ¶ 52.

divided by use, gender and age.  From design through manufacturing, distribution, marketing, and sale, the apparel industry is made up of an aggregate of specialists, generally concentrating on their particular subcategory of apparel.  Facts ¶¶ 46, 47, 50.  This is the reason that CKI uses numerous different licensees to manufacture and sell the array of CALVIN KLEIN products.  Duhaime Decl. Exh 18 (Murry 8/7/03 Tr. 22-24).   Such industry segmentation is obvious even to the consumer, who confronts a variety of product categories and departments in today's department store setting.

**Prior Interactions Between the Parties' Predecessors**

CC Corp. never objected to use of the CALVIN KLEIN mark on any class of apparel, not even boys' tailored clothing (Counterclaims ¶27), nor did it object to the many instances in which  "Calvin," "Calvin Boot Cut" and "The Original Calvin" were used to refer to CALVIN KLEIN underwear, jeanswear, or young women's clothing– uses which were open and notorious, particularly the Brooke Shields TV commercial, and CALVIN alone for men's fragrances.  See Szeto Decl. Exhs. I and J.

However, in a handful of letters exchanged over thirty-plus years of coexistence, the parties' predecessors and CKI's licensees corresponded about the use of "Calvin" alone to refer to CALVIN KLEIN products.[6]  Defendants portray this correspondence as proof of an implicit understanding that CC Corp. was "Calvin" whereas CKI's predecessors were "Calvin Klein".  Counterclaims ¶¶ 30-32.  To the contrary, at best the letters show CC Corp.'s attempt to protect its CALVIN mark in the boys' and men's tailored field, nothing more.

For example, the correspondence in 1983 shows that CC Corp. had no objection to use of the phrase "CALVIN 100% ACTIVEWEAR" on CALVIN KLEIN men's activewear,

---

[6]  All of the known letters are attached as Duhaime Decl. Exhs. 35-48.

nor did it object in 1981 to use of CALVIN alone on men's fragrances.  See letters at Duhaime Decl. Exhs. 41-43, 47-48.  By contrast, in 1978, while noting that the expansion of the CALVIN KLEIN brand to men's clothing would be expected in view of the success in women's wear, CC Corp. requested only that retailers refer to the menswear as CALVIN KLEIN, not simply as CALVIN.  Duhaime Decl. Exh. 40.

Likewise, in the joint opposition to registration of the mark CALVIN CONDOMS in the late 1980's, CC Corp. and CKI's predecessor relied on documents which showed CKI's use and advertisement of the mark CALVIN alone for its line of young women's clothing.  Szeto Decl. Exh. H.  CC Corp.'s lack of objection to, indeed, its *reliance upon*, this use flies in the face of Defendants' assertions that the parties' predecessors had agreed that only CC Corp. could use "Calvin" alone.

It is clear from this early correspondence that CC Corp. had no interest in preventing CKI's use of "Calvin" alone in any context other than men's and boys' tailored apparel.[7]  As Calvin Siegal, CC Corp.'s namesake and president from 1951 to 1986, testified, his company had no objection to the use of CALVIN alone "in ladies' wear or items that we didn't manufacture."  Duhaime Decl. Exh. 22 (C. Siegal Tr. 50).  Nor did CC Corp. take steps to discourage the media from referring to CALVIN KLEIN products as, simply, "Calvin" or "Calvins."  Id. at 36-37.  Regardless of its characterization by the parties, there is no dispute that the correspondence also proves that CC Corp. was aware of, and made no attempt to stop, the extension of the CALVIN KLEIN brand from women's wear into the many other categories of apparel including menswear, jeanswear, fragrances (labeled CALVIN), and boyswear.  Duhaime Decl. Exhs. 38, 39, 40, 47, 41, 43 and 46.

---

[7]  This correspondence, of course, predates CC Corp.'s abandonment of the CALVIN mark for men's tailored apparel.

## CCC's Acquisition of Calvin Youthwear

By the early 1990's, CC Corp. was operating as a subsidiary of Palm Beach Clothing, which in turn was owned by Plaid Clothing Group, Inc.  Facts ¶¶ 56, 58-60.  Calvin Youthwear was the name of the division that was carrying on CC Corp.'s line of boys' tailored clothing, under several owned and licensed brand names as well as private labels.  Most of its sales were of apparel under the GANT brand.  In 1995, after experiencing financial difficulties, Plaid Clothing Group declared bankruptcy.  Shortly thereafter, Plaid decided to sell the youthwear division, and concentrate on its core tailored menswear business.   Duhaime Decl. Exh. 55 at P 003338.

Alperin Inc., a contract sewing business that had done some trouser work for CC Corp. made the successful bid.  Jim Alperin, an officer of Alperin, Inc., incorporated CCC in about early 1996 for the purpose of receiving and continuing the youthwear business (Facts ¶ 64).  In April 1996, CCC purchased, for one dollar, several trademarks used in connection with the assets being acquired, including the '999 CALVIN registration for boys' tailored apparel.  Later, in May 1996, CCC purchased the '306 CALVIN registration for men's suits and sport coats, for another dollar.  Facts ¶¶ 67, 71, 75.

## CCC's Subsequent New Calvin Marks

Despite the six decade legacy of CALVIN being used by CC Corp. only for specific items of boys' (and briefly men's) tailored clothing, starting in 1998 and continuing through 2002, CCC filed ten intent-to-use applications in the PTO for new marks incorporating the word "Calvin", such as CALVIN AMERICA, CALVIN SPORT,[8] BABY CALVIN (with and

---

[8] CCC admits that it does not use and no longer intends to use the CALVIN SPORT mark.  Duhaime Decl. Exh. 1 (Defs. Admissions) Nos. 270, 273.

without design)[9], CALVIN (& star design), CALVIN SCHOOLWEAR, CALVIN (& stripe

design), and CALVIN COLLECTION (collectively, the "New Calvin" marks). These

applications cover a vast array of men's, women's, girls', boys' and infants' apparel. See

Duhaime Decl. Exh. 51. While some of the New Calvin applications are limited to certain

intended users, such as "infants and children" (the BABY CALVIN marks) or "boys and

children" (CALVIN & stripe design), most cover goods that are not limited as to size or gender.

  The goods listed in the New Calvin applications go far beyond the products and

intended users covered by CC Corp.'s prior registrations. See Facts ¶¶ 78-80, 82; Expert Report

of Siegrun D. Kane ¶¶ 32-39. Moreover, each of the New Calvin marks present a different

commercial impression from one another and from the earlier CC Corp. registrations for

CALVIN on boys' and men's tailored clothing. Kane Report ¶ 26, 40; Duhaime Decl. Exh. 20

(Santacroce Tr. 12; 43-45). Starting in about March of 2000, CKI and the Trust petitioned the

PTO to cancel or oppose CCC's New Calvin applications and registrations ("the TTAB

Proceedings"). Duhaime Decl. Exh. 52. The TTAB Proceedings have been stayed pending this

litigation. Duhaime Decl. Exh. 63.

  CCC is not currently selling any goods under the marks CALVIN SPORT or

BABY CALVIN (with or without design). CCC's first license under the New Calvin marks was

in 2001 to Concorde Apparel, to make CALVIN AMERICA men's tailored clothing; sales under

that license have been $2 million a year or less. CCC's sales of goods under the other New

Calvin marks have been minimal, since the only other licensees, Star Ride, Such A Tees and

North American Design Group, took licenses in March, April and July 2005, respectively. Their

sales have totaled just over $1 million to date. Facts ¶ 87.

---

  [9] Two of the New Calvin applications utilized a font that Plaintiffs believe is confusingly
similar to the stylized lettering long used by CKI and its licensees on CALVIN KLEIN product.

While CCC's sales of its infringing Calvin apparel has been small, it is actively seeking – and has found – licensees capable of significant sales in the future.

**The Ford Likelihood of Confusion Survey - The Marketplace**

Plaintiffs commissioned a marketing research and consulting firm to design and implement a study to test whether any of the New Calvin marks as used by CCC and its licensees presented a likelihood of confusion among the relevant public.  The Declaration and Rule 26 Report of Dr. Gerald L. Ford[10] ("Ford Report") describes the surveys, five in all.  The surveys were designed in accordance with the generally accepted standards and procedures for survey research, including the criteria set forth in the Federal Judicial Center's *Manual for Complex Litigation, Fourth*.

Survey respondents were screened according to their clothing purchase habits and other eligibility criteria and then shown specimens of apparel produced by Defendants bearing one of the New Calvin marks.   Respondents were then asked what company they believed put out the garment, what other brand names are used by that company, whether the garment was put out with or without the approval of any other company; and whether or not the company that puts out the garment has a business affiliation with any other company.  The same procedure was repeated in a set of control interviews, where the name "Calvin" on labels, hangtags and as necessary the garments themselves was replaced with the control name "Cayden."  In total, 1080 interviews were conducted, 540 in the test cells and 540 in the control cells.  The results of the surveys indicated significant confusion levels for the New Calvin marks:

---

[10]  Dr. Ford has thirty-one years of experience in litigation-related marketing research surveys, and has lectured and written extensively on the subject of proper survey design and execution.  Ford Report ¶¶66-67.  He has been qualified and accepted as an expert in marketing and market research in over fifty trials before federal and state courts and administrative agencies such as the PTO's Trademark Trial and Appeal Board. Id. ¶ 69.

| Mark | Garments shown | Test Cell (%) | Control Cell (%) | Net Confusion (%) |
|------|----------------|---------------|------------------|-------------------|
| CALVIN SCHOOLWEAR | Boys' shirts, girls' jumpers and/or boys' or girls' pants | 24.07 | .93 | 23.14 |
| CALVIN (Star) | Boys' t-shirts, boys' denim pants and/or boys' or girls' non-denim | 36.12 | -- | 36.12 |
| COLLECTIONS[11] BY CALVIN | Adult size t-shirts | 61.11 | 1.85 | 59.26 |
| CALVIN AMERICA | Men's suit and/or sport coat | 55.55 | 3.71 | 51.84 |
| CALVIN (Stripes) | Men's trousers | 34.26 | .93 | 33.33 |

See Ford Report, ¶¶ 3-12; 35-59.  A response was only coded as signaling confusion if the

respondent indicated that the clothes came from, or were made under approval or affiliation with,

Calvin Klein.  Based on these results, Dr. Ford concludes that the surveys are evidence that the

New Calvin marks present a likelihood of confusion for the relevant universe of potential

purchasers.  Ford Report ¶ 13,60.

Significantly, Defendants' marketing expert admits that confusion resulting from

the sale of their new products is likely, and may be as high as one out of three purchasers.  He

considers such confusion "tough luck" for Plaintiffs.  Duhaime Decl. Exh. 20 (Santacroce Tr. 20,

30-32).

---

[11]  This mark was tested even though it is not the subject of a New Calvin application, because CCC's licensee for t-shirts for the New Calvin mark CALVIN COLLECTION is using the phrase COLLECTIONS BY CALVIN instead, with CCC's approval.  Duhaime Decl. Exh. 14 (Maleh Tr. 49, 89-90).

**The Helfgott Likelihood of Confusion Survey - The New Calvin Applications**

       In 2003, in connection with the TTAB Proceedings, Dr. Myron Helfgott, a veteran market researcher who has qualified and testified as an expert in numerous courts and PTO proceedings, designed and conducted a survey directed to the risk of confusion presented by the New Calvin marks when used with the goods listed in their respective applications. Consistent with PTO practice, as the issue in a trademark opposition or cancellation involve a person's right to registration of a mark, Dr. Helfgott's survey showed respondents the New Calvin marks and the list of goods on index cards, instead of actual garments bearing the trademark. Miles Labs., Inc. v. Naturally Vitamin Supplements, Inc., 1 U.S.P.Q.2d 1445, 1455-60 (T.T.A.B. 1986). Dr. Helfgott tested all ten of the New Calvin applications, and found for each that over 70% of respondents stated their belief that the products would be put out by or for Calvin Klein. Dr. Helfgott testified that these were the highest levels of confusion he had ever seen. Duhaime Decl. Exhs. 10, 54. (Helfgott Tr. 5, 31, 43, 47, 50; Expert Report of Dr. Myron J. Helfgott).

       In sum, Defendants' position is that confusion does not matter, that they can expand their product line nonetheless, and that confusion is "tough luck"for Calvin Klein. Duhaime Exh. 20 (Santacroce Tr. 32).

## ARGUMENT

**I.    Summary Judgment Is Appropriate --
      There Is No Genuine Issue Of Material Fact**

       Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)); see also Information Superhighway, Inc. v. Talk Am. Inc.,

395 F. Supp. 2d 44, 49-50 (S.D.N.Y. 2005).   The "mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment".  Anderson, 477 U.S. at 247-48.

Indeed, a moving party can meet its burden by showing that there is an absence of

evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-25

(1986).  The nonmoving party then must come forward with "specific facts showing that there is

a genuine issue for trial," Fed. R. Civ. P. 56(e), by a "showing sufficient to establish the

existence of [every] element essential to that party's case, and on which that party will bear the

burden of proof at trial."  Celotex, 477 U.S. at 322.  While reasonable ambiguities and inferences

should be resolved in favor of the non-moving party, "those inferences must be supported by

affirmative facts and based on relevant admissible evidence.  A party [opposing] a summary

judgment motion cannot 'rely on mere speculation or conjecture as the true nature of facts to

overcome the motion.'"  Information Superhighway, 395 F. Supp. 2d at 50 (citing Fed. R. Civ. P.

56 and Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir. 1995)).

## II.     Plaintiffs Have Priority Over CCC in All
## Fields of Apparel Except Boys' Tailored Clothing

CCC argues that its product expansion represented by the New Calvin

applications and sales is protected by the legal doctrine of "natural expansion."  However, the

well-established law of this Circuit is contrary.  CCC's predecessors remained for decades a

producer of certain items of boys' (and for a few years men's) tailored clothing,[12] while the

Calvin Klein business thrived and expanded into all areas of apparel.  Moreover, CCC's

predecessors sat on whatever rights to expand they may have had, and long delayed objecting to

---

[12]     As stated above, CCC's predecessor abandoned its rights to use Calvin for men's suits and sport coats.  See Plaintiffs' second motion for summary judgment filed contemporaneously herewith.

CKI's use of "Calvin" alone.  CKI's entry and undeniable success in fields of the apparel market that CCC's predecessors never entered or had abandoned create legal rights that trump any right of expansion that they may once have had.  Simply put, CCC's present ambitions far exceed its legal rights.  This is particularly true, as here, when such expansion will create high levels of confusion among the consuming public.

The Second Circuit has repeatedly recognized that the senior user of a mark in a particular field of goods may be prevented from expanding into related fields under certain circumstances, which include "most often the senior user's laches coupled with the junior user's efforts to market its product."  Physicians Formula Cosmetics Inc. v. West Cabot Cosmetics Inc., 857 F.2d 80, 82 n.1 (2d Cir. 1988).  The Second Circuit has emphasized that such right of expansion is "easily lost due to delay" and that "[w]hen a senior user delays in enforcing its rights, a junior user may acquire a valid trademark in a related field, enforceable against even the senior user."  Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 217 (2d Cir. 2003) (citing Physicians Formula, 857 F.2d at 82-83 n.1).

Protection of the rights of an intervening junior user in the related field has long been the rule in this Circuit, ever since the user of GOLD MEDAL for straight wheat flower was precluded from entering the prepared flour market, after nearly 20 years of delay during which a competitor had built up a successful business around GOLD MEDAL buckwheat and pancake flour.  France Milling Co. v. Washburn-Crosby Co., 7 F.2d 304 (2d Cir. 1925).  Enjoining the junior user in light of the senior user's "laches, indeed the acquiescence, of so many years," while the junior user was building up its own business, would work an "inequity . . . too manifest for discussion."  Id. at 306.

This Circuit reaffirmed this rule, in a case where the senior user of WHITE HOUSE for coffee and teas was precluded from using the mark for milk, in light of another

company's marketing of evaporated milk under the same brand for nearly twenty years, with full knowledge by and even joint advertisement with the senior user.  Dwinell-Wright Co. v. White House Milk Co., 132 F.2d 822 (2d Cir. 1943).   While a trademark owner may wish to protect a market related to his own "for later exploitation", an "owner's rights in such appendant markets are easily lost; they must be asserted early, lest they be made the means of reaping a harvest which others have sown."  Id. at 825.  For "sixteen years – the plaintiff did nothing to stop" the second comer, Judge Hand noted; "it merely stood aside and watched the [junior user's] business grow at great cost to colossal proportions."  Id.; accord Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp., 105 F.2d 908, 911 (2d Cir. 1939)("If the plaintiff proposed to keep the radio market as an unused preserve, it was bound to protect it against invaders by affirmative action; it could not impose upon them the duty of divining its own purposes. . .").

In Physicians Formula, 857 F.2d 80 (2d Cir. 1988), this Circuit agreed with the district court that the plaintiff could not, under the natural expansion doctrine, extend its mark PHYSICIANS & SURGEONS into the area of skin creams and hand lotions, despite decades of use on hand soaps, since it had long known of, and failed to take action against, a later user of the mark PHYSICIANS FORMULA on creams and lotions.   Physicians Formula, 857 F.2d at 82, n.1.  The junior user had developed intervening rights in its own mark and market, sufficient to preclude the senior user from encroaching into territory that might have originally been within the natural zone of expansion.  Accord Clark & Freeman Corp. v. Heartland Co., 811 F. Supp. 137, 142 (S.D.N.Y. 1993) ("defendants, acting in good faith, have built up substantial goodwill in the name 'Heartland' as applied to clothing.  It would be inequitable to allow plaintiffs to exploit defendants' substantial goodwill at this late date, simply because they are the senior user.").

- 16 -

Most recently, the Second Circuit held that the user since 1933 of the mark PATSY'S PIZZERIA (sometimes called just "Patsy's") for restaurant services was precluded from selling PATSY'S brand pasta sauce, after a long-time competitor, Patsy's Italian Restaurant, had already entered that field using the PATSY'S name.  Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209 (2d Cir. 2003).  The Court observed that "[w]here the junior user operates in a market separate though related to that of the senior user, the senior user's 'right to preempt is a very slender thread indeed,'. . . and is easily lost due to delay."  Id. at 216-17, citing Dwinell-Wright, 132 F.2d at 825.  In Patsy's, the senior user was precluded from expanding because it had waited five years after its competitor began selling PATSY'S brand pasta sauce before attempting to enter that market.

In the case at bar, CCC's predecessors sat on their rights and watched passively *for decades* while the CALVIN KLEIN brand reached staggering heights of success.  This case is on all fours with Patsy's, in which the Court noted that where "the senior user has tolerated for decades the junior user's competition in the same market with a name similar to that of the senior user, the justification for preserving for the senior user use of a dominant component of its name in a related field vanishes entirely."  317 F.3d at 217 (emphasis omitted).[13]  France Milling and its progeny in this Circuit bar Defendants' attempt to now expand their product line and family of marks, in light of their predecessors' clear laches while the CALVIN KLEIN brand flourished.

Recognizing the preclusive effect of this line of cases, CCC suggests that the relevant "fields" in this case are merely men's vs. women's vs. children's apparel, and that it has

---

[13]  Defendants' marketing expert, George Santacroce, opined that CCC's sales of CALVIN apparel is likely to cause confusion with CALVIN KLEIN, but opines that such confusion does not matter.  Duhaime Decl. Exh. 20 (Santacroce Tr.17-20).  His position is directly counter to the law in this Circuit.

prior rights for <u>all</u> of men's and children's apparel based on its predecessor's sales of <u>certain</u> specific items of boys' tailored clothing and sporadic sales of men's suits and sport coats.[14] There is no legal support for this argument.

The Second Circuit has held that the classification of goods "depends far more on commercial custom than upon the inherent nature of the product.  Dog biscuit and pilot bread are closely allied in physical origin, and so are guncotton and calico, but in commercial classification they are poles apart."  <u>France Milling</u>, 7 F.2d at 305.  As shown <u>supra</u> p. 6, numerous witnesses have testified that the apparel industry is segmented into types and styles of clothing, in addition to being segregated into clothing by gender and age.  Tailored clothing for boys and men are recognized throughout the industry as discrete, highly specialized, fields of apparel.  They require specialized manufacturing capabilities, involve different distributors, and large retailers employ buyers who concentrate on tailored clothing.  Facts ¶ 46.  Jim Alperin's family business is a testament to that specialization, having remained for years strictly a trouser producer for CC Corp., while suit jackets were made in different facilities by different manufacturers.  Duhaime Decl. Exhs. 3, 4, and 9 (Alperin 10/16/03 Tr. 7; Alperin 10/20/05 Tr. 164; Fletcher 2/14/06 Tr. 54).  CCC's argument that its predecessor's sale of boys' and men's suits, under a CALVIN mark, now gives it the freedom to make any sort of menswear or children's clothing it pleases, under new marks (Duhaime Exh. 20 (Santacroce Tr. 43-45)), notwithstanding Calvin Klein's activities in the interim, defies the law and common sense.

If CCC desires to expand its product offerings beyond its traditional tailored clothing line, it appears to own several other brands for children's clothing which can be the

---

[14]  For the reasons set forth in Plaintiffs' second motion for summary judgment, filed concurrently herewith, CCC's predecessors abandoned their trademark rights under CALVIN for men's tailored clothing, and CCC did not acquire rights in that field.  Thus, CCC's 1999 entry into men's tailored actually postdates CKI's established presence in that field.

basis for that expansion.  Facts ¶ 86.  It is simply not true that CCC must be pigeonholed into making only boys' tailored clothing, as it has complained it will be if not permitted to use the New Calvin marks on goods outside that field.  Rather CCC simply will be prevented from reaping where it has not sown.

## III.    The New Calvin Marks Are Likely to<br>Cause Confusion with CALVIN KLEIN

Now that the CALVIN KLEIN brand is famous and used in so many categories of apparel for men, women, and children, CCC's expansion of its predecessors' activities by using the New Calvin marks on wholly new categories of apparel would impermissibly confuse consumers as to the source, sponsorship, or affiliation of the goods.

This Circuit weighs the eight Polaroid factors in reaching a conclusion on the issue of likelihood of confusion.  Those factors are: (1) the strength of the mark; (2) the degree of similarity between the marks; (3) the proximity of the products; (4) the likelihood that the senior user of the mark will bridge the gap; (5) evidence of actual confusion; (6) the junior user's bad faith in adopting the mark; (7) the quality of the junior user's product; and (8) the sophistication of consumers.  Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820 (1961).  Each of these factors is weighed in the context of the others to determine if, on balance, a likelihood of confusion exists.  Id. at 495; W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 572 (2d Cir. 1993); Lang, 949 F.2d at 580.  The Court's findings on each factor are issues of fact, but weighing the factors, and the ultimate conclusion as to likelihood of confusion, are matters of law.  See Plus Prods. v. Plus Discount Foods, Inc., 722 F.2d 999, 1004-5 (2d Cir. 1983).  No single Polaroid factor is determinative in establishing likelihood of confusion, but "each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product."  Lois Sportswear

U.S.A. Inc. v. Levi Strauss & Co., 799 F.2d 867, 872 (2d Cir. 1986). In this Circuit, "likelihood of confusion" encompasses confusion as to source, sponsorship, affiliation, connection or identification. Syntex Labs., Inc. v. Norwich Pharmacal Co., 437 F.2d 566, 568 (2d Cir. 1971).

(a) **Strength of the mark**

The more famous a mark, the wider the ambit of legal protection. Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 258 (2d Cir. 1987). In this case, there can be no serious dispute Plaintiffs' CALVIN KLEIN and CALVIN name and marks are famous. Proof of secondary meaning further serves to enhance the strength of a trademark, Nikon, Inc. v. Ikon Corp., 803 F. Supp. 910, 915-916 (S.D.N.Y. 1992), and here such proof is substantial, including the evidence of hundreds of millions of dollars in advertising over the years for CALVIN KLEIN products, sales in the billions of dollars worldwide, and thousands of mentions over the years by the trade and general media publications noting the enormous success of Calvin Klein's business and advertising campaigns. The extensive sales and advertising expenditures alone are a sufficient basis for a court to infer a strong consumer association. See Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1222-23 (2d Cir. 1987).

The CALVIN KLEIN mark is so strong, the ads so memorable, that "Calvin" has become nearly a household name; numerous brand recognition surveys conducted in the ordinary course of CKI's business show that CALVIN KLEIN continues to enjoy near universal product recognition in the apparel categories. Facts ¶¶ 39-40; Duhaime Decl. Exh. 33. The use by the public and the media of the nickname "Calvin" to refer to CALVIN KLEIN apparel, products, and the company has been so ubiquitous, and so consistent over the years, Facts ¶¶ 35-41, that Plaintiffs have obtained rights in the term CALVIN as a matter of law. See Nat'l Cable Television Assoc. v. Am. Cinema Editors, Inc., 937 F.2d 1572, 1577-78 (Fed. Cir. 1991) ("abbreviations and nicknames of trademarks or names used *only* by the public give rise to

protectable rights in the owners" because "public use by others inures to the claimant's benefit and, where this occurs, public use can reasonably be deemed use 'by' that party"); Anheuser-Busch, Inc. v. Power City Brewery, Inc., 28 F. Supp. 740, 743 (W.D.N.Y. 1939) ("'Bud' has long been used as an abbreviation or nick-name of 'Budweiser' and as such is ordinarily associated with the plaintiff's product . . . and plaintiff is entitled to the same protection in its use as it is regarding the parent word."); Atlantic Monthly Co. v. Fredrick Ungar Publ'g Co., 197 F. Supp. 524, 529-30 (S.D.N.Y. 1961); Volkswagenwerk AG v. Lieffring Indus., Inc., 188 U.S.P.Q. 650, 653 (T.T.A.B. 1975) ("BUG" a protectable nickname); Coca-Cola v. Busch, 44 F. Supp. 405, 410 (E.D. Pa. 1942) ("Coke" protectable as much as full Coca-Cola trademark).

This factor weighs strongly toward a finding of likelihood of confusion.

### (b) **Similarity of the Marks**

It is beyond dispute that while the New Calvin marks are not identical to Plaintiffs' CALVIN KLEIN or CALVIN, they all share the dominant "Calvin" name. Furthermore, the New Calvin marks add terms like "sport" and "collection" that have long been used as part of CALVIN KLEIN SPORT and CALVIN KLEIN COLLECTION. Moreover, the Ford Survey results, and the verbatim comments recorded from the respondents, indicate that the marks' use of Calvin foment confusion: respondents regularly focused on the "Calvin" portion of the New Calvin marks. There is no genuine issue of fact on this factor, which favors Plaintiffs.

### (c) and (d) **Proximity of the Products and Bridging the Gap**

Defendants' expert acknowledges that their expansion under the New Calvin marks has "reached far beyond the original product classification" CC Corp. started with. Duhaime Exh. 20 (Santacroce Tr. 12-13). By filing the New Calvin applications, CCC announced an intention to bridge, and in some categories has begun to bridge through minimal sales, the gap from its tailored boys' clothing into fields of apparel that CKI and its predecessors

have long occupied.  CCC continues to seek new licenses for the New Calvin applications.

Unless enjoined by this Court, it appears there will be no gap left for CCC to bridge if it

succeeds in its intended expansion.  Such product similarity weighs in favor of a finding of

likelihood of confusion.  See Lois Sportswear, 799 F.2d at 874; Volkswagenwerk AG v.

Wheeler, 814 F.2d 812, 818 (1st Cir. 1987).

     (e) **Actual Confusion**

         Proof of actual confusion is not required to prevail on a claim of trademark

infringement.  Lois Sportswear, 799 F.2d at 875 (actual confusion "need not be shown to prevail

under the Lanham Act"); Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,

109 F.3d 275, 284 (6th Cir. 1997) (difficulty of obtaining actual confusion evidence means that

"a lack of such evidence is rarely significant").  Given CCC's limited use of some of the New

Calvin marks, i.e., annual sales peaking at $2 million in the menswear category (Wattenberg Tr.

110), about $1 million to date in Star Ride's children's apparel (Facts ¶ 87) and about $43,000 in

t-shirt sales (Maleh Tr. 68), the fact that the parties are as yet unaware of actual confusion is not

surprising.  In this Circuit, consumer studies such as the Ford survey have been accepted as

circumstantial evidence of actual confusion.  PPX Enters., Inc. v. Audiofidelity Enters, Inc., 818

F.2d 266, 271 (2d Cir. 1987).  The percentages of consumer confusion indicated by the Ford and

Helfgott surveys are far above the levels of confusion credited by courts in this and other circuits

as indicative of a likelihood of confusion.  See, e.g., Grotrian Helfferich, Schulz, Th. Steinweg

Nachf. v. Steinway & Sons, 365 F. Supp. 707, 716 (S.D.N.Y. 1973), modified on other grounds,

523 F.2d 1331 (2d Cir. 1975) (8.5%); RJR Foods, Inc. v. White Rock Corp., 603 F.2d 1058,

1061 (2d Cir. 1979) (15% to 20%); Lon Tai Shing Co. v. Koch + Lowy, 19 U.S.P.Q.2d 1081,

1097 (S.D.N.Y. 1990) (18% is "within the range of cognizable confusion recognized in this

Circuit"); Exxon Corp. v. Tex. Motor Exch. of Houston, Inc., 628 F.2d 500, 507 (5th Cir. 1980)

(15%); James Burrough Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 277-79 (7th Cir. 1976)

(15%); James Burrough Ltd. v. Lesher, 309 F. Supp. 1154, 1159 (S.D. Ind. 1969) (11%).

Moreover, Defendants' expert acknowledges that confusion is likely to occur.  Supra p. 11.  This

factor strongly favors Plaintiffs.

>    (f) **Junior User's Bad Faith**

>    As stated, Defendants' marketing expert concedes that his clients' expansion

makes consumer confusion likely, and possibly at very high levels.  Defendants' "tough luck"

attitude about Plaintiffs' rights, and wanton disregard of the public's interest in protection from

confusion, rules out any colorable claim of good faith.  Duhaime Decl. Exh. 20 (Santacroce Tr.

17-20, 30-32).  Moreover, there is no evidence that CCC requested a search or opinion of

counsel prior to use of the New Calvin marks notwithstanding the fame of the CALVIN KLEIN

brand.  CCC's deliberate use of a stylized font for CALVIN BABY and CALVIN

SCHOOLWEAR which is strikingly (if not confusingly) similar to a font long used by CKI is

further evidence that CCC's New Calvin applications were not innocent.  Facts ¶ 103.

Moreover, CCC's wrongful renewal of its '306 registration is further evidence of bad faith, as

shown in the accompanying motion.  Even viewing all facts in the light most favorable to

Defendants, this factor favors Plaintiffs.

>    (g-h) **Quality of CCC's Products and Purchaser Sophistication**

>    Since Plaintiffs cannot control the quality of Defendants' products, they face a

loss of goodwill if a purchaser of apparel bearing one of the New Calvin marks is not satisfied

and assumes Calvin Klein is the source of the product.  See Scarves by Vera, Inc. v. Todo

Imports Ltd., 544 F.2d 1167, 1172 (2d Cir. 1976).  Some of the respondents in the Ford survey

questioned the quality of Defendants' products.  Duhaime Decl. Exh. 68.  Moreover, the

purchaser for Defendants' products is the ordinary consumer.  These factors also favor Plaintiffs.

On balance, no view of the facts of record relevant to the <u>Polaroid</u> analysis would reasonably permit the fact finder to conclude that confusion is not likely.

## IV.   **Defendants' Counterclaims**

In addition to their request for adjudication of priority in all men's and children's apparel categories, Defendants have sought relief based on Plaintiffs' alleged infringement of their CALVIN registrations by Plaintiffs' use of "Calvin" alone on apparel.  See Counterclaims II to IV.  But there is absolutely no evidence that Plaintiffs have used Calvin alone for boys' tailored clothing, the only field where CCC enjoys priority.  All of the uses of "Calvin" alone by CKI are in fields of apparel where Plaintiffs have priority.[15]

Moreover, as described above, CKI and its predecessors have over the years followed the lead of the trade and media and made occasional use of the name "Calvin" on a multitude of other garments including t-shirts and young women's apparel, and in connection with jeanswear, with CCC's predecessors' full knowledge.  From time to time, CCC's predecessors were informed about such uses, and did not object to them; other times, the apparel was simply produced and there is no evidence of any consultation between the companies.  CCC is now seeking to reverse years of acquiescence to such use, claiming that it presents a likelihood of consumer confusion, but there are no facts to support this claim.

In every case, the clothing also carried tags or labels bearing one or more of the full CALVIN KLEIN marks.  The inclusion of the famous CALVIN KLEIN name when "Calvin" alone is used "significantly reduces, if not altogether eliminates, the likelihood that

---

[15]   The only use that Defendants have identified in this case is a single t-shirt, which was produced at least three years ago.  Szeto Decl. Exh. L.  This use is no different in kind from the myriad other uses of "Calvin" which CKI and its predecessor made, incidental to (and accompanied by) their use of CALVIN KLEIN, and to which CCC's predecessor never objected, unless the use was in connection with boys' or men's tailored clothing.  See discussion supra p. 6-7.

consumers will be confused as to the source of the parties' products." Nabisco, Inc. v. Warner-Lambert Co. , 220 F.3d 43, 46 (2d Cir. 2005) (citing Bristol-Meyers Squibb Co. v. McNeil-PPC, Inc., 973 F.2d 1033, 1046 (2d Cir. 1992)) and cases cited therein.  Indeed, the presence of a famous brand name such as CALVIN KLEIN "goes far toward countering any suggestion of consumer confusion arising from any of the other Polaroid factors."  Id.  It is clear that Plaintiffs have been careful to indicate, by use of tags and labeling, that the source of "Calvin" products is CKI or its licensees, a practice which forecloses any claim of unfair competition.

        Consumers who see a CALVIN KLEIN brand t-shirt with the word "Calvin" on the front will have no doubt as to its correct source: the namesake company of the famous designer Mr. Calvin Klein.  Defendants are at a loss to explain why the press and the public are free to continue to refer to CALVIN KLEIN apparel, perfume and other products as "Calvin", but Plaintiffs should be prevented from doing so.  There is no support in the law for this position, and no genuine issue of material fact relevant to these claims.  Plaintiffs are thus entitled to summary judgment on Defendants' remaining counterclaims.

## CONCLUSION

In light of their priority in the apparel field, with the exception of certain items of boys' tailored clothing, Plaintiffs are entitled to judgment as a matter of law on their claims of federal trademark infringement and unfair competition.  Because Plaintiffs claims of infringement and unfair competition arising under common law and New York state law are coextensive with their federal claims, see Information Superhighway, 395 F. Supp. 2d at 56, and cases cited therein ("common law causes of action for trademark infringement and unfair competition mirror Lanham Act claims" and elements of proof are the same), judgment should be entered in their favor on Counts VII and VIII of the Complaint as well.

As a consequence of the likelihood of confusion engendered by CCC's New Calvin marks, Plaintiffs are further entitled to an order instructing the Commissioner of Trademarks to cancel the recently-issued New Calvin registrations, and a further order instructing CCC to expressly abandon its pending New Calvin applications in the PTO.

For the foregoing reasons, Defendants' counterclaims should be dismissed with prejudice.


Dated: March 20, 2006    By: _____/s/ Tila M. Duhaime / _____
                              Edward E. Vassallo (EV 6588)
     New York, New York       Timothy J. Kelly (TK 8241)
                              Tila M. Duhaime (TD 8787)
                              FITZPATRICK, CELLA, HARPER
                                 & SCINTO
                              30 Rockefeller Plaza
                              New York, New York 10112
                              (212) 218-2100

                              Attorneys for Plaintiffs Phillips-Van Heusen Corporation,
                              Calvin Klein, Inc., and Calvin Klein Trademark Trust

NY_MAIN 558425v1

- 26 -